**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| EFOORA, INC., | ) | No. 09 B 20591 |
| | ) | |
| Debtor. | ) | Judge Goldgar |

<u>**MEMORANDUM OPINION**</u>

Before the court for ruling are two motions in the chapter 7 bankruptcy case of Efoora,

Inc.  Trustee Catherine Steege has moved to sell certain rights under an 2008 asset purchase

agreement between the bankruptcy estate and an entity called Applied Biomedical.  An investor

in Efoora, Douglas Jaeger, has objected to the sale.  Jaeger, in turn, has moved to dismiss the

bankruptcy case for lack of jurisdiction.  Jaeger contends that Efoora, a Delaware corporation,

had been dissolved for more than three years when the bankruptcy case was filed and so lacked

the capacity to file it.

On April 23, 2012, the court held an evidentiary hearing on the sale motion.  Following

the hearing, the parties briefed the motion to dismiss.  For the reasons discussed below, Jaeger's

motion to dismiss will be denied and Steege's sale motion will be granted.

**1.  Jurisdiction**

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §

1334(b) and the district court's Internal Operating Procedure 15(a).  The sale motion is a core

proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (N).  As for the motion to dismiss, a

federal court always has jurisdiction to determine its jurisdiction.  *Gladney v. Pendleton Corr.*

*Facility*, 302 F.3d 773, 775 (7th Cir. 2002).

## 2. Background

Efoora was a company that claimed to be engaged in the development of tests for HIV,

mad cow disease, and blood glucose levels.  *See United States v. Dokich*, 614 F.3d 314, 315 (7th

Cir. 2010).  In fact, Efoora "was nothing but a phony."  *Id.*  "[T]housands of investors" in Efoora

were defrauded out of "millions of dollars" – at least $10 million and perhaps as much as $55

million.  *Id.* at 316, 321.  Efoora's principals were convicted of an assortment of federal criminal

offenses, *id.* at 316, and the Securities & Exchange Commission brought a separate civil action

against the principals accusing them of securities fraud, *see S.E.C. v. Efoora, Inc.*, No. 06 C 3526

(N.D. Ill. Aug. 25, 2009) (judgment entered).

In mid-2007, a year after filing the civil action, the S.E.C. moved to have a receiver for

Efoora appointed.  (S.E.C. action, Dkt. No. 42).  The district court granted the motion (*id.*, Dkt.

No. 46), and Ira Bodenstein was appointed receiver (*id.*, Dkt. No. 47).  Bodenstein later sought

and received permission from the district court to sell substantially all of Efoora's assets to

Applied Biomedical, LLC.  (*Id.*, Dkt. Nos. 105, 123; Tr. at 27).[1/]  Applied Biomedical is a

limited liability company co-owned by Dr. Subhash Varshney, a California medical doctor, and

his wife.  (Tr. at 26, 95-96).  Dr. Varshney was an investor in Efoora and formed Applied

Biomedical for the purpose of acquiring Efoora's assets.  (*Id.* at 26).  His goal was to

manufacture and sell the HIV and blood glucose test kits that Efoora had only claimed it was

going to manufacture and sell.  (*See id.* at 28-29).

Applied Biomedical offered $1 million cash for the assets, cash that Dr. Varshney

himself would furnish.  (Tr. at 27).  Applied Biomedical's offer was the only one Bodenstein

---

[1/]     The transcript of the April 23, 2012, hearing on the sale motion is cited in this
opinion as "Tr. ___."

received.  (*Id.* at 19).  Accordingly, on April 4, 2008, Bodenstein and Applied Biomedical entered into an asset purchase agreement ("the APA") under which Applied Biomedical became the owner of Efoora's assets.  (Trustee Ex. 1).

But the $1 million from Dr. Varshney was not the only consideration for the sale.  Under section 1.6 of the APA, Applied Biomedical was also required to make certain "earnout payments" to the receiver.  (Trustee Ex. 1 at 5-7).  The contractual provision is complex, but the gist is that starting in 2009, Applied Biomedical would pay the receiver a percentage of either its net sales or its net income, as well as additional amounts.  (*Id.*).  If Applied Biomedical had no sales, however, it would have no obligation to make any further payments.  (*Id.*; *see also* Tr. at 22-23).

On March 6, 2009, Bodenstein moved for permission to file a chapter 7 bankruptcy case on Efoora's behalf.  (S.E.C. action, Dkt. No. 146).  Bodenstein noted in his motion that it would take "approximately 3 to 5 years" for Applied Biomedical to have enough sales to incur payment obligations under the APA – "if [the company] is able to manufacture and sell rapid diagnostic tests."  (*Id.* at 3, ¶ 9).  Given "the uncertainty of the Earn Out," the "length of time that it will take for the Receiver to receive sufficient funds to make a meaningful distribution," and the potentially "complex claims resolution process," Bodenstein suggested that the bankruptcy court was "better suited" than the district court to handle claims administration involving thousands of investors.  (*Id.* at 3-4, ¶¶ 10-11; *see also* Tr. at 24).

The district court granted Bodenstein's motion (S.E.C. action, Dkt. No. 151), and on June 5, 2009, Bodenstein filed this chapter 7 bankruptcy case for Efoora.  Steege was appointed trustee.  (Tr. at 130).  Apparently unknown to Bodenstein or the district court, however, the Delaware Secretary of State had previously declared Efoora no longer in good standing.  On

-3-

March 1, 2006, the corporation had forfeited its certificate of incorporation (or corporate charter) "for non-payment of taxes" and, in the words of a certification the Secretary issued, had become "inoperative and void." (Jaeger Mot. Ex. A).

On February 13, 2012, almost three years after the bankruptcy case began, Steege filed her sale motion. Steege noted that since the closing of the sale, Applied Biomedical had not been obligated to make any earnout payments. She also noted that she had been told Applied Biomedical would be unable to continue in business without additional financing, and the earnout provision was preventing the company from obtaining it. (Trustee Mot. at 2, ¶ 5). Steege added that financial information she had received confirmed that Applied Biomedical was unlikely to make any earnout payments in the near future, and the company might well go out of business if the APA were not amended. (*Id.* at 3, ¶ 7). Steege accordingly sought permission to enter into an amendment to the APA under which Applied Biomedical would buy the estate's rights to the earnout payments in exchange for $50,000.[2/] (*Id.* at 2, ¶ 6).

When the motion was presented, Jaeger appeared and objected. In the written objection he subsequently filed, Jaeger argued (among other things) that Steege had engaged in insufficient due diligence before agreeing to the sale, and Applied Biomedical's "troubles [were] exaggerated." (Jaeger Obj. at 6).[3/] Given the factual questions that Jaeger's objection presented,

---

[2/]     Because the amendment's effect would be to sell to Applied Biomedical the estate's remaining rights to receive payments under the APA, Steege's motion is one for permission to sell estate property under section 363(b) of the Bankruptcy Code, 11 U.S.C. § 363(b). *Cf. In re UAL Corp.*, 443 F.3d 565, 571 (7th Cir. 2006) (stating that a motion to modify a debtor-in-possession's collective bargaining agreement "had to be approved by the bankruptcy judge under section 363(b)(1)").

[3/]     Jaeger made other arguments, as well. His main one was that the rights to the earnout payments are not property of the bankruptcy estate Steege can sell because any payments would ultimately go to Efoora's investors. He described the investors as "third party beneficiaries" of the APA. (Jaeger Obj. at 3). Not so. The APA was an agreement between

-4-

the motion was set for an evidentiary hearing on April 23, 2012.

On April 20, just three days before the hearing was to begin, Jaeger moved to dismiss the bankruptcy case for lack of jurisdiction.  Jaeger asserted in the motion that Efoora had been "administratively dissolved" on March 1, 2006, and the three-year wind-up period under Delaware law had ended on March 1, 2009, before the case was filed.  (Jaeger Mot. at 1). Therefore, Jaeger argued, Efoora lacked the capacity to file bankruptcy, and in the absence of an eligible debtor the court lacked jurisdiction over the case.

Because the dismissal motion was filed at the last minute with insufficient notice, *see* Fed. R. Bankr. P. 2002(a)(4), and was not presented until the day of the hearing, the court elected to proceed with the hearing and have the motion briefed later.  (Tr. at 12-14).  Jaeger was also required to serve all creditors with notice of the motion (*id.* at 223-25), and he did so (Bankr. Dkt. No. 53).  The notice set a deadline for creditors to respond to the motion.  (*Id.*).  No creditor  responded either to join in the motion or oppose it, but Steege filed a written response opposing the motion.

Both the motion to dismiss and the sale motion are now fully briefed and ready for ruling.

### 3.  Discussion

Jaeger's motion to dismiss will be denied, and Steege's sale motion will be granted.

---

Applied Biomedical and Bodenstein as receiver, and the rights to the earnout payments belonged to Bodenstein in that capacity.  Sections 1.6(b) and (c) of the APA expressly declared that "the Purchaser shall pay to the *Receiver*" any amounts due.  (Trustee Ex. 1 at 5 (emphasis added)). No payments were to be made to investors.  When the bankruptcy case was filed, Bodenstein's contract rights therefore became part of the bankruptcy estate, the same as all other Efoora assets.  *See In re Resource Tech. Corp.*, 254 B.R. 215, 220 (Bankr. N.D. Ill. 2000) ("The scope of property interests included in the estate under § 541(a) is quite broad, and includes any contract rights that a debtor possesses at the time of the bankruptcy filing.").  As trustee, Steege is entitled to administer the asset for the benefit of creditors.

Despite the loss of its certificate of incorporation, Efoora was eligible to be a debtor in

bankruptcy.  Steege, meanwhile, has easily met the low threshold for permission to sell estate

property under section 363(b).

### a.  Dismissal Motion

The case will not be dismissed for lack of jurisdiction.  Under Delaware law, applicable

here, a corporation that has lost its certificate of incorporation for non-payment of taxes retains

the capacity to file a bankruptcy case.

With limited exceptions, section 109(b) of the Code permits a "person" to be a debtor in a

chapter 7 case.  11 U.S.C. § 109(b).  Under section 101(41), a "person" includes a "corporation."

11 U.S.C. § 101(41).  "Corporation," in turn, is defined broadly in section 101(9) to include a

wide variety of business and non-business entities.  11 U.S.C. § 101(9).  The Code, however,

does not address whether a particular corporation has the capacity to file bankruptcy.  State law

governs that question.  *See Chicago Title & Trust Co. v. Forty-One Thirty-Six Wilcox Bldg.*

*Corp.,* 302 U.S. 125, 127-28 (1937); *In re International Zinc Coatings & Chem. Corp.*, 355 B.R.

76, 83 (Bankr. N.D. Ill. 2006).  Because Efoora was incorporated in Delaware, its ability to be a

debtor depends on Delaware law.

Jaeger argues that the revocation of Efoora's certificate of incorporation on March 1,

2006, means that as of that date the corporation had been "administratively dissolved."  (Jaeger

Mot. at 1).  Jaeger acknowledges that section 278 of the Delaware General Corporation Law

extends the life of all corporations, "whether they expire by their own limitation or are otherwise

dissolved," for an additional three years for certain purposes.  Del. Code Ann. tit. 8, § 278.

Jaeger also acknowledges that during the wind-up period, a dissolved corporation is eligible to

be a debtor in a bankruptcy case.  *See International Zinc*, 355 B.R. at 83 (dictum).  But after the

wind-up period it is ineligible, *see id.*, and Efoora's bankruptcy was filed after that period had

passed.  By June 2009, Jaeger contends, Efoora had ceased to exist and could not be a debtor.

Jaeger is mistaken.  Efoora was not dissolved.  It forfeited its certificate of incorporation

for failure to pay franchise taxes, which is not the same.  Section 510 of the Delaware General

Corporation Law penalizes corporations that fail to pay franchise taxes.  It provides:  "If any

corporation . . . neglects or refuses for 1 year to pay the State any franchise tax or taxes, . . . the

charter of the corporation shall be void, and all powers conferred by law upon the corporation

are declared inoperative . . . ."  Del. Code Ann. tit. 8, § 510.  The loss of a certificate of

incorporation, however, is not "dissolution."  *See United States v. Northeastern Pharm. & Chem.

Co.*, 810 F.2d 726, 747 (8th Cir. 1986) (holding that a Delaware corporation that had "lost its

charter" had "not been dissolved"); *Board of Managers of Soho Int'l Arts Condo. v. City of New

York*, No. 01 Civ. 1226 (DAB), 2005 WL 1153752, at *11 & n.19 (S.D.N.Y. May 13, 2005)

(observing that under Delaware law, "'[d]issolution' of a corporation is a specific legal term and

is not the legal equivalent of a corporation declared inactive for non-payment of franchise

taxes").  In fact, section 277 of the Delaware General Corporation Law declares that "[n]o

corporation shall be dissolved under this chapter" until all franchise taxes have been paid.  Del.

Code Ann. tit. 8, § 277.

Unlike dissolution, forfeiture of the certificate of incorporation does not mean the

corporation ceases to exist.  Section 312 of the Delaware General Corporation Law provides that

a corporation whose certificate of incorporation has become void may "at any time procure an

extension, restoration, renewal or revival of its certificate of incorporation."  Del. Code Ann. tit.

8, § 312(b).  Reinstatement of the certificate

> validate[s] all contracts, acts, matters and things made, done and
> performed within the scope of its certificate of incorporation by the

-7-

> corporation, its officers and agents during the time when its
> certificate of incorporation was forfeited or void pursuant to this
> title, . . . with the same force and effect and to all intents and
> purposes as if the certificate of incorporation had at all times
> remained in full force and effect.

Del Code tit. 8, § 312(e).

Given this reinstatement right, Delaware courts hold, a corporation that has had its

certificate of incorporation revoked for failure to pay franchise taxes "is not completely dead."

*Wax v. Riverview Cemetery Co.*, 24 A.2d 431, 436 (Del. Super. Ct. 1942).  It is instead merely

"in a state of coma from which it can be easily resuscitated."  *Id.*; *see also Frederic G. Krapf &*

*Son, Inc. v. Gorson*, 243 A.2d 713, 715 (Del. 1968) (noting that "in Delaware it has long been

the law that a Delaware corporation is not dead for all purposes following forfeiture of its

charter"); *Harned v. Beacon Hill Real Estate Co.*, 84 A. 229, 234 (Del. 1912) (observing that

even though a corporation had forfeited its charter and the three-year wind-up period had passed,

the corporation "nevertheless was sufficiently alive and existent" to own property).  Forfeiture of

a certificate of incorporation therefore "does not extinguish the corporation as a legal entity."

*Wax*, 24 A.2d at 436.[4/]

Because a corporation that has forfeited its certificate of incorporation still exists as a

legal entity, it retains its eligibility to be a debtor in a bankruptcy case.  In *Watts v. Liberty*

*Royalties Corp.*, 106 F.2d 941, 944 (10th Cir. 1939), the court specifically reached this

conclusion under facts similar to those here.  A receiver had been appointed for defendant

Liberty, a Delaware corporation, in July 1931.  *Id.* at 941.  Not quite a year later, in April 1932,

---

[4/]       The Delaware decisions distinguish decisions on corporate dissolution under
Illinois law – including *Chicago Title & Trust Co. v. 4136 Wilcox Bldg. Corp.*, 302 U.S. 120
(1937), a decision that concerned Illinois law and on which Jaeger relies in his motion.  *See, e.g.,*
*Wax*, 24 A.2d at 435-36.

Liberty forfeited its charter for failure to pay what the court called its "annual license fees." *Id.*

at 941-42. Six years after that, in 1938, Liberty filed a reorganization petition under the

Bankruptcy Act. *Id.* at 942. The receiver (who had not filed the petition) and several

shareholders moved to dismiss the case, but the district court apparently refused, instead

approving the petition and ordering the appointment of permanent trustees. *Id.* The receiver and

shareholders appealed, arguing that Liberty had no capacity to file bankruptcy after the three-

year wind-up period under Delaware law. *Id.* at 943.

The Tenth Circuit rejected the argument. The court agreed that under Illinois law as the

*4136 Wilcox Bldg. Corp.* decision construed it, a dissolved corporation "is ended for all time and

for all purposes." *Id.* at 943-44. But, the court said: "That is not so under the laws of Delaware.

If it were, life could not be breathed into the corpse, it could not be revived nor reinstated, nor

could all things done by the corporation during its period of suspension be validated by its

reinstatement." *Id.* at 944. The court continued:

> So long as a corporation may be reinstated by the payment of
> delinquent fees and have validated all of its acts that were done
> while its powers were suspended, the corporation is not dead. Its
> powers are only in suspension and reinstatement of its charter
> restores it to all of its powers and validates all of its acts, including
> the acts done while its charter was suspended. The corporation
> had power to institute this proceeding for its reorganization . . . .

*Id.* The Delaware Superior Court cited and discussed *Watts* with approval in *Wax*, *see Wax*, 24

A.2d at 436, and the Delaware Supreme Court in turn cited *Wax* with approval in *Gorson*, *see*

*Gorson*, 243 A.2d at 715. *Gorson* is the last word on the subject from the highest court of the

state. It appears, then, that *Watts* is still good law.[5]

---

[5]    One difference between *Watts* and this case is that Liberty was reinstated six
months after the appeal was taken, *see Watts*, 106 F.2d at 942, whereas the un-reinstated Efoora
is still "in a state of coma," *Wax*, 24 A.2d at 436. It might therefore be argued that Liberty's

Because Efoora was not dissolved but only had its certificate of incorporation revoked for non-payment of franchise taxes, the corporation still existed as a legal entity and still had the capacity to file a bankruptcy case. Jaeger's motion to dismiss the case for lack of jurisdiction will be denied.

### b.  Sale Motion

Steege's motion to amend the APA, effectively selling the earnout rights to Applied Biomedical, will be granted. Steege has given a rational business justification for the sale and has more than adequately supported her decision.

Section 363(b)(1) of the Bankruptcy Code permits a trustee, after notice and a hearing, to "use, sell, or lease" property of the estate outside the ordinary course of business. 11 U.S.C. § 363(b)(1). A sale is permissible and will be authorized as long as the trustee has an "'articulated business justification.'" *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991) (quoting *In re Continental Air Lines*, 780 F.2d 1223, 1226 (5th Cir. 1986)); *see also UAL Corp.*, 443 F.3d at 571 (stating that the transaction must "make[ ] good business sense" and "the creditors as a whole should benefit"); *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1994) (noting that the sale must be "in the best interest of the estate").

The "business judgment" test, as it is sometimes called, differs from the business judgment rule under corporate law. 3 *Collier on Bankruptcy* ¶ 363.02[4] at 363-18 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012). The bankruptcy court reviews the trustee's

---

bankruptcy case was retroactively validated in a way that Efoora's case has not been. But Liberty's reinstatement appears not to have played any role in the *Watts* court's decision. The question on appeal, the court said, was whether "on May 5, 1938" – the day the petition was filed, not later – Liberty had the "power to institute a voluntary proceeding for its reorganization." *Watts*, 106 F.2d at 943. The court answered that question affirmatively without ever mentioning the corporation's subsequent return to consciousness. *See id.* at 943-44.

business judgment "to determine independently whether the judgment is a reasonable one." *Id.*

At the same time, the court "should not substitute its judgment for the trustee's." *Id.* A trustee

has considerable discretion when it comes to the sale of estate assets, and that discretion is

entitled to "great judicial deference" as long as a sound business reason is given. *In re State*

*Park Bldg. Grp., Ltd.*, 331 B.R. 251, 254 (N.D. Tex. 2005); *In re Murphy*, 288 B.R. 1, 5 (D. Me.

2002); *In re Gulf States Steel, Inc. of Ala.*, 285 B.R. 497, 516 (Bankr. N.D. Ala. 2002).[6/]

The trustee bears the burden of demonstrating a sound business justification. *See In re*

*Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983). A party objecting to a sale, in turn, must

produce "some evidence respecting its objections." *Id.* Approval of a sale rests with the

bankruptcy court's discretion. *Corporate Assets, Inc. v. Paloian*, 368 F.3d 761, 767 (7th Cir.

2004); *In re Irvin,* 950 F.2d 1318, 1320 (7th Cir. 1991).

Steege offered a sound business justification for selling the estate's rights to the earnout

payments for $50,000. She explained that her decision to propose the sale required answers to

two questions: first, whether any earnout payments under the APA were due the estate from

Applied Biomedical; and second, whether Applied Biomedical was reasonably likely to owe the

estate earnout payments in the future. (Tr. at 163-64).

The answer to the first question, whether Applied Biomedical owed the estate any

earnout payments, was no. The estate's rights to payments depended on Applied Biomedical

having net sales. (Tr. at 163). Applied Biomedical, Steege learned, had had no sales at all since

the APA was signed in 2008 and so had no revenue at all. (*Id.* at 131, 140, 163). As a

consequence, no earnout payments were due. (*Id.* at 131, 184).

---

[6/]     Jaeger's contention at the hearing – that "a high level of scrutiny" must be given
to a trustee's sale motion under section 363(b) (Tr. at 217) – is simply wrong.

The answer to the second question, whether Applied Biomedical was reasonably likely to make earnout payments in the future, was also no. (Tr. at 169, 173-74). Steege was told that Dr. Varshney had run out of money to operate the company – had "tapped out his personal finances" (*id.* at 169) – and would have to shut it down without financing (*id.* at 170, 173, 185-86). It would take another $7 million to produce marketable HIV and blood glucose test kits and sell them, and no one would give him financing unless the APA were amended to remove the earnout provision. (*Id.* at 141).

Even if Dr. Varshney did get financing, Steege said, she suspected Applied Biomedical was unlikely ever to get off the ground. (Tr. at 140, 173-74). After three years, the company had not only sold no test kits but had not yet developed one that could be sold. (*Id.* at 141). The receiver, Bodenstein, had told her he was unsure "if there really was a viable product here," that it was unclear whether Efoora had been "a viable business, or whether it was just completely a fraud." (*Id.* at 140-41).

Steege asked for and received financial information to support what she was hearing about Applied Biomedical's circumstances. (Tr. at 147, 150). She obtained tax returns from 2008-2010 showing that Applied Biomedical had no income for any of those years and losses of $171,238 in 2008, $740,487 in 2009, and $594,257 in 2010. (Trustee Exs. 3-5; see also Tr. at 31-33). She obtained a 2011 financial statement for Applied Biomedical. (Tr. at 150). She obtained a short, written history of the business summarizing the company's problems, both financial and technical. (*Id.*; *see also* Jaeger Ex. 6). And she obtained a package of materials explaining the projection that $7 million would be necessary for Applied Biomedical to produce and sell test kits. (Tr. at 150).

Steege also insisted that Dr. Varshney or someone else testify at the sale hearing and

confirm the representations made to her.  (Tr. at 131-32).  Dr. Varshney testified both at a

deposition taken at Mr. Jaeger's instance and again at the sale hearing.  (*Id.* at 132, 155, 157-58,

160).  On both occasions, Steege said, his answers under oath were consistent with the

information she had been given.  (*Id.* at 155).

    At the hearing, Dr. Varshney testified that Applied Biomedical had acquired the assets of

Efoora with the hope of producing HIV and blood glucose test kits – and he had used his own

money for the acquisition, mortgaging his house and borrowing against his life insurance policy.

(Tr. at 27-28).  Although Efoora itself had never sold any test kits, he had been optimistic about

Applied Biomedical's prospects.  (*Id.* at 28-29).  He soon discovered, however, that the

equipment Applied Biomedical had acquired was rusted, broken, and inoperative – " [what] I

inherited was [a] piece of junk," he said (*id.* at 91) – and Efoora's servers containing critical

technological data were missing (*id.* at 29-30, 45, 91; *see also* Jaeger Ex. 6).  Applied

Biomedical moved the equipment to California (*id.* at 77, 109-10), and Dr. Varshney spent more

of his own money, quite a bit of it, having the equipment repaired and refurbished (*id.* at 77;

Jaeger Ex. 6).

    But despite all his effort and expense, Dr. Varshney said, Applied Biomedical had never

produced properly functioning medical test kits.  (Tr. at 35, 114).  Only prototypes had been

produced, not kits with the kind of consistency necessary for FDA approval and mass

production.  (*Id.* at 48-50, 110-12, 126-27).  After four years, he said, the kits were still in the

"research and development phase."  (*Id.* at 37, 49, 79).  No test kits ready for sale had been

produced, and so, of course, no kits had been sold.  (*Id.* at 46, 48).  Because there had been no

sales, Applied Biomedical had had no income – had "not earned a single dime."  (*Id.* at 27, 30,

32-33, 35).  And because there had been no income, no earnout payments under the APA had

been made.  (*Id.* at 27).

At this point, Dr. Varshney said, Applied Biomedical was unable to continue in business. The company was incurring $60,000 to $70,000 in monthly expenses but was still earning nothing.  (Tr. 35, 123).  To date, he and his wife had provided all of the money for the company's operations, and they had no more.  (*Id.* at 123).  "I have borrowed [from] every corner," he commented.  "I don't have any money left."  (*Id.* at 123).  According to Dr. Varshney, the company needed another $7 million to get to the point of selling test kits.  (*Id.* at 38, 105, 107).  Without financing, Applied Biomedical would have to shut down.  (*Id.* at 38, 41).

Dr. Varshney had tried to raise money, but so far his efforts had met with no success. (Tr. at 38).  The obstacle was the earnout provision in the APA.  "Basically," he explained, "this industry is quite mature.  A lot of competition.  Profit margin is very low, and the cost of the production is higher as compared to what it was five years ago."  (*Id.* at 39-40; *see also id.* at 72).  As a consequence, the earnout provision, which would deprive Applied Biomedical of a portion of its profits, was discouraging prospective lenders and investors.  (*Id.* at 40-41, 56, 101, 103, 105).  To them, Dr. Varshney said, the provision was "prohibitive" (*id.* at 40), a "red flag" (*id.* at 101).  More than one prospective lender had told him that until the earnout provision was removed, a loan was impossible.  (*Id.* at 56, 103).

Even with additional funding, Dr. Varshney admitted, it would take two to three years to get test kits to market.  (Tr. at 107, 113, 128).  It would be as if Applied Biomedical were "starting all over again from square one."  (*Id.* at 107).  And it was always possible that Applied Biomedical would never produce a marketable HIV or blood glucose test kit.  (*Id.* at 115).  "I survive on hope," he said.  "So far, I am a failure."  (*Id.* at 123).

Steege testified, finally, that several other considerations influenced her decision to sell

the earnout payment rights back to Applied Biomedical:

      • Nothing in the APA gives her the legal ability to force Applied Biomedical to do anything. She cannot make the company have a certain level of capital, obtain financing, produce test kits for sale, sell test kits overseas, or even stay in business. (*Id.* at 141, 143-44, 158, 169).

      • Efoora has more than 4,000 creditors, some of whom have told Steege they want to file their final tax returns and write off their losses from the Efoora debacle. (Tr. at 180). These creditors have asked why the bankruptcy case, open for three years, has not been closed. (*Id.* at 134, 142, 180).

      • Of the more than 4,000 creditors, only one, Jaeger, has objected to the proposed sale. (Tr. at 136).

      • No one else, including Jaeger, has made a better offer for the earnout payment rights. (Tr. at 139, 142-43, 172).

      • The estate is holding $180,000 to $190,000. (Tr. at 182-83). No creditors in the case have been paid anything yet, and no creditors will be paid anything until a final report is filed and the case is closed. (*Id.* at 181-82).

      • The estate stands to gain $50,000 from the sale (Tr. at 144), increasing the estate's size by more than 20%. If the sale does not go through and Applied Biomedical goes out of business, the estate will receive nothing. (*Id.*).

With no money having come into the estate in the past three years and the prospect of any money ever arriving highly doubtful, Steege concluded that on balance it no longer made sense to wait. (Tr. at 142). Better to take the sure $50,000 than speculate that, contrary to all the evidence, Applied Biomedical would not only stay in business but would turn a profit. Steege's

decision to sell the earnout payment rights back to Applied Biomedical is an eminently

reasonable one, makes "good business sense," *UAL Corp.*, 443 F.3d at 571, and is "in the best

interest of the estate," *Telesphere*, 179 B.R. at 552.  Steege is a sophisticated bankruptcy lawyer

with almost twenty-five years of experience as a panel trustee (Tr. at 129), and her decision is

entitled to considerable deference, *State Park*, 331 B.R. at 254.

In opposing the sale, Jaeger argues that Dr. Varshney has exaggerated Applied

Biomedical's problems.  Jaeger introduced at the hearing a series of e-mails from 2009 and 2010

between Dr. Varshney and a man named Peterson who had been associated somehow with

Efoora (*see* Tr. at 158), e-mails in which Dr. Varshney suggested that success for Applied

Biomedical was only months away (*see id.* 62-64, 73-78, 81-83, 89-90; Jaeger Exs. 7-11, 13).

Jaeger noted, and Steege conceded, that it would be in Applied Biomedical's interest to get rid of

the APA's earnout payment provision.  (*See* Tr. at 157).

Dr. Varshney acknowledged the e-mails but explained them credibly as no more than

mistaken optimism on his part.  They were "truthful" (Tr. at 112) and represented what he

genuinely thought at the time (*id.* at 76, 82, 83, 90).  "I was very optimistic," he said.  "Basically,

I'm a very optimistic person, positive-thinking person."  (*Id.* at 112).  Ultimately, though, his

predictions proved incorrect; Applied Biomedical failed to reach the benchmarks he mentioned

in the e-mails.  (*Id.* at 112).  "I was wrong," he admitted.  (*Id.* at 114).  Steege dismissed the e-

mails as not "really say[ing] anything concrete," as merely making predictions of performance

that Applied Biomedical's tax returns later showed had been incorrect.  (*Id.* at 158).  She was

right to dismiss them.

Along the same lines, Jaeger suggested that if the consistency necessary to obtain FDA

approval were an obstacle, Applied Biomedical could sell its test kits overseas without approval.

(*See, e.g.*, Tr. at 46).  But Jaeger offered no evidence or legal argument to support his suggestion.

Dr. Varshney testified without contradiction that at least for the HIV test kit, FDA approval was

necessary to obtain an export license.  (*Id.* at 46-47, 119).  He also testified without contradiction

that there is little potential for selling these kits outside the United States, FDA approval or not,

because companies in other countries are "mass-producing these test kits [for a] considerably

cheaper price," one with which he could not compete.  (*Id.* at 120).  Applied Biomedical's focus,

he said, "is to produce and sell in the U.S.A."  (*Id.*).

Jaeger also criticizes Steege for proposing the sale without conducting a sufficient

investigation.  Steege admitted that she did not obtain copies of Applied Biomedical's bank

statements or checks (Tr. at 187), did not have signed copies of the tax returns (*id.* at 186), did

not visit the California facility where the equipment was located (*id.* at 160), did not examine

Applied Biomedical's technical problems with the HIV test (*id.*), did not learn about the industry

(for example, by talking to companies in the Chicago area) (*id.* at 166-68), and did not hire an

auditor or accountant to conduct an independent analysis of Applied Biomedical's financial

health (*id.* at 162-63).

Jaeger is right that a trustee must conduct an adequate investigation, *see, e.g., JAS*

*Partners, Ltd. v. Boyer*, No. 1:10-cv-303-TLS, 2011 WL 1486205, at *4 (N.D. Ind. Apr. 19,

2011); *In re Wolverine, Proctor & Schwartz, LLC*, 436 B.R. 253, 261-62 (D. Mass. 2010), but

Steege's investigation was quite adequate under the circumstances.  She spoke repeatedly to Dr.

Varshney's counsel (who made the initial overture and explained to her Applied Biomedical's

situation), obtained a package of financial documents that she concluded backed up what she had

been told about Applied Biomedical's history and prospects, and then required Dr. Varshney to

make his representations about the company under oath – which he did, both at his deposition

-17-

(where Jaeger's counsel and Steege questioned him) and again at the sale hearing.  No evidence
was produced to her (or for that matter at the hearing) showing that anything Dr. Varshney had
said was false.  (Tr. at 158, 160, 185).

Could Steege have done more?  Certainly.  A more extensive investigation is always
possible.[7/]  What Jaeger forgets is that a chapter 7 trustee has no independent source of money to
fund the investigation of potential sales.  The money comes from the estate.  The expenses
Jaeger would have had Steege incur to hire experts or travel to California would only have
resulted in administrative claims paid *before* the claims of other unsecured creditors.  *See* 11
U.S.C. §§ 503(b)(1)(A), 507(a)(2).  Every penny Steege spent on a more thorough investigation
would thus have reduced the $180,000 to 190,000 she is holding to pay more than 4,000
defrauded investors.  A trustee has to balance the need for investigation against her responsibility
not to waste estate assets.  *In re Commercial Loan Corp.*, 316 B.R. 390, 703-04 (Bankr. N.D. Ill.
2004).  It cannot be said that Steege struck the balance incorrectly here.

Finally, Jaeger tried to question Steege at the hearing about whether she had considered a
different amendment to the APA, one under which the estate's rights to earnout payments would
be subordinated to the rights of any new lenders rather than eliminated.  (Tr. at 170).  Such an
arrangement would presumably address the concerns that section 1.6 of the APA had generated
among prospective lenders and so permit Applied Biomedical to obtain financing without
removing altogether the estate's right to earnout payments.  Jaeger's attempt to explore this
possibility was cut short, however, when an objection to the question was sustained on relevance

---

[7/]       It is unclear, however, what Steege might have learned from Applied
Biomedical's bank statements or checks that could have affected her decision, given that she had
the tax returns.  As for the tax returns being unsigned, Dr. Varshney testified that the returns
introduced into evidence were in fact Applied Biomedical's returns (Tr. at 30-31), and the
information in them was correct (*id.* at 31-33).

grounds. (*Id.* at 171).

The subject was irrelevant. A trustee has a responsibility to "maximize the value obtained from a sale," true enough. *In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998); *see also In re Lakeside Dev., LLC*, No. CA 11-05211-dd, 2012 WL 619071, at *4 (Bankr. D.S.C. Feb. 24, 2012). But a proposed sale is properly disapproved only in favor of a better alternative that is "in hand," *In re Broadmoor Place Invs., L.P.*, 994 F.2d 744, 746 (10th Cir. 1993), and there was no evidence that any lender would provide financing if the APA were amended in the manner Jaeger was proposing. Jaeger offered no evidence of any.[8/] Dr. Varshney, meanwhile, testified (without objection) that he had floated the idea to potential lenders but had been unable to generate any interest. (Tr. at 191).

Even if prospective lenders had been willing to provide financing under Jaeger's suggested amendment, Steege could fairly have rejected the proposal in favor of Dr. Varshney's $50,000 deal. The Jaeger amendment would have benefitted the estate only if Applied Biomedical had (1) succeeded in producing a marketable product, (2) ended up with net sales, and (3) generated enough net income to satisfy in full its new debt obligations. The possibility that any of this might happen was no better than speculation, what Dr. Varshney accurately termed "our hopes." (Tr. at 123). A trustee is the "conservator of the estate and must, to the extent possible, be risk averse." *In re Salander*, 450 B.R. 37, 48 (Bankr. S.D.N.Y. 2011) (internal quotation omitted). It is reasonable, consequently, for a trustee in Steege's position to accept a lower, safer offer over a higher, riskier one. *See Bakalis*, 220 B.R. at 532; *see also In re*

---

[8/]      If this proposed amendment were as attractive as Jaeger implies, and if Applied Biomedical's future were as rosy as Jaeger apparently believes, Jaeger himself could have sought to purchase the estate's rights with a view to amending the APA just this way. But he made no offer. (Tr. at 139).

*Frezzo*, 217 B.R. 985, 993 (Bankr. E.D. Pa.) (rejecting criticism of trustee for accepting "a

binding 'bird in the hand'" over "the proverbial 'two in the bush'"), *appeal dismissed*, 225 B.R.

581 (E.D. Pa. 1998).

Because Steege supplied a sound business reason for the sale of the earnout rights to

Applied Biomedical, and because she conducted a sufficient investigation before proposing the

sale, her motion to amend the APA will be granted.

### 4.  Conclusion

For these reasons, the motion of Douglas Jaeger to dismiss the bankruptcy case for lack

of jurisdiction is denied, and the motion of chapter 7 trustee Catherine Steege for authorization to

amend the asset purchase agreement between the estate and Applied Biomedical, LLC, is

granted.  A separate order will be entered consistent with this opinion.

Dated: June 6, 2012

_____
A. Benjamin Goldgar
United States Bankruptcy Judge